IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALICIA SUAREZ                  :         CIVIL ACTION
ADMINISTRATRIX OF THE ESTATE   :
OF SEAN SUAREZ, AND ON BEHALF  :
OF THE WRONGFUL DEATH          :
BENEFICIARIES                  :
                               :
          v.                   :
                               :
CITY OF PHILADELPHIA et al.    :         NO. 10-426
                               :


MEMORANDUM

McLaughlin, J.                            December 14, 2011


          This is a section 1983 and negligence suit brought by

Alicia Suarez, as administratrix of her son's estate, against

Lawrence Bloomfield, a fire service paramedic ("FSP") and the

City of Philadelphia ("City") (collectively "the defendant").

The plaintiff's son, Sean Suarez, died from injuries he sustained

when his motorbike crashed into an emergency service vehicle

driven by Bloomfield.  At the time of the accident, Bloomfield

was responding to a 911 call.  He had the vehicle's warning

lights and siren on, but was driving the wrong way down 30th

Street, a one-way street, for approximately three blocks.  The

accident occurred as Bloomfield crossed the intersection between

30th Street and Dauphin Street.  Suarez died several weeks after

the accident.

The plaintiff's constitutional claim is based on a "state-created danger" theory of substantive due process.  The defendant moved for partial summary judgment on the plaintiff's constitutional claim.  The Court will grant the defendant's motion.

I.   Summary Judgment Record

The facts here are undisputed unless otherwise noted.

A.   The Accident

On August 27, 2009, Lawrence Bloomfield was operating a Philadelphia Fire Department ambulance, accompanied by FSP Nicole Warriner.  At approximately 7:00 p.m. he responded to a 911 call that a 43-year-old woman had fallen.  The dispatch records show that the patient was listed as conscious.  Pl. Br., Ex. G.  Bloomfield was told that she was unconscious.  Pl. Br., Ex. A ("Bloomfield Dep.") 69.

Bloomfield activated the lights and sirens on his vehicle.  He was proceeding north on 31st Street towards his destination and made a right turn onto West Colona Street.  After one block, Bloomfield made an illegal left turn on to 30th Street, a one-way street.  There were no other vehicles traveling on the road.  Id. 71-75; Pl. Br., Ex. B ("Warriner Dep.") 60.

The parties dispute the point at which Bloomfield

became aware he had made an illegal turn.  According to Bloomfield, he did not know at the time he turned that 30th Street ran only southbound.  Bloomfield Dep. 71-75.  There is, however, a clearly marked one-way sign at the intersection of West Colona and 30th Street and cars parked on both sides of 30th Street face southbound, the direction of travel. Pl. Br., Ex. J 1-4.  In addition, according to FSP Carter, who worked with Bloomfield for several months, Bloomfield appeared to know the direction of roads in this area.  Pl. Br., Ex. D ("Carter Dep.") 21-23.

At some point, Bloomfield realized that he was traveling in the wrong direction on 30th Street.  Bloomfield Dep. 81-82; Pl. Br., Ex. L 2-3.  Despite knowing he was going the wrong direction, Bloomfield proceeded northbound on 30th Street towards Dauphin Street, passing at least one street where he could have turned off of 30th Street.  Bloomfield Dep. 81-82.

The intersection of 30th Street and Dauphin Street is controlled by a traffic light.  As Bloomfield approached, the light was green for cars traveling on 30th Street, albeit in the opposite direction of Bloomfield's travel.  Bloomfield did not come to a complete stop before entering the intersection,  but slowed the vehicle.  Bloomfield Dep. 93-96, 134-35.

When Bloomfield entered the intersection, his vehicle

-3-

was struck on the driver's side door by a motorbike driven by
Suarez.  Suarez was seriously injured by the crash.  Bloomfield
attended to Suarez until another emergency vehicle arrived.
Carter Dep. 29-30.  Suarez died on September 12, 2009.

      B.    <u>Training of Fire Service Personnel by the City</u>

      Fire Department Directive 26 deals with the Safe
Operation of Fire Vehicles.  Among other things, it says:

> Companies are not to drive against the normal flow of
> traffic (buck traffic) when responding to incidents.
> The only exception will be where fire/smoke is in
> evidence and no more than <u>ONE FULL BLOCK</u> would be
> bucked to reach the incident scene.

Def. Br., Ex. D ("Directive 26") ¶ 4.11.10.  Directive 26 also
says that "nothing in this directive shall be construed to
supersede any state/city law, or ordinance."  <u>Id.</u> ¶ 1.2.
Pennsylvania state law allows drivers responding to an emergency
call to "disregard regulations governing direction of movement"
so long as siren and warning lights are being used and the driver
exercises due regard for safety.  75 Pa. Cons. Stat. § 3105 (a)-
(c), (e).

      Bloomfield received a copy of Directive 26 when he
attended the Fire Academy.  Bloomfield Dep. 18.  Although
Bloomfield does not recall receiving classroom training on the
Directive, other FSP's did receive classroom training at the

Academy on directives.  Warriner Dep. 13-14; Pl. Br., Ex. C
("Selby Dep.") 9-10; Carter Dep. 9-10.  In addition, training on
the directives is required in order to graduate from the Fire
Academy.  Def. Br., Ex. C ("Wilson Aff.") ¶ 7.  Bloomfield also
received some road training before becoming a driver.  Bloomfield
Dep. 20-21.

FSP's are required to participate in station exercises,
which include refresher training on the directives and driver
awareness training.  Wilson Aff. ¶ 9; Pl. Br., Ex. N ("Costo
Dep.") 15-19.  No evidence has been presented on the frequency of
these training courses or whether the Fire Department ensures
compliance with this rule.

Following an investigation of this accident, Battalion
Chief Kucowski recommended remedial driver training and an oral
reprimand for Bloomfield.  Pl. Br. Ex. H.  Bloomfield did not
receive a reprimand or additional training.  Bloomfield Dep. 129.

Bloomfield understood Directive 26 and understood that
its primary purpose was safety.  Bloomfield Dep. 35.  Despite
Directive 26, Bloomfield and other FSP's bucked traffic for more
than one full block even in situations where there was no
evidence of fire or smoke.  Bloomfield Dep. 36-39; Selby Dep. 12-
13; Carter Dep. 14-15.  Battalion Chief Kucowski did not "have a
problem" with drivers bucking traffic in violation of the

-5-

Directive if there were other factors at play, such as making an inadvertent turn.  Pl. Br., Ex. F 68-69.  No directive, however, provides guidance for these "grey areas."  Id.

In 2004, the Deputy Commissioner of the Fire Department commissioned a study to address the several-year escalation of vehicular accidents involving the Fire Department.  The study, entitled Preventing Emergency Vehicle Accidents in the Philadelphia Fire Department, concluded that the Fire Department had an ineffective driver training program and that there was no uniformity or consistency in the training process.  The study found that there was viable evidence of a direct correlation between inadequate training and the number of accidents occurring.  The study recommended that the City adopt driver training for all members at least twice a year and comply with national safety standards.  Pl. Br., Ex. M 4, 27.  Battalion Chief Costo, who has been the Safety Officer for the Fire Department since 2004, had never seen the study prior to his deposition in this case.  Costo Dep. 8-9, 61-62.

II.  <u>Analysis</u>[1]

The plaintiff alleges that Suarez was deprived of his substantive due process right under the Fourteenth Amendment to be free from a state created danger.  The defendant makes three arguments: (1) the plaintiff's constitutional rights were not violated because the state-created danger claim is not satisfied; (2) Bloomfield is entitled to qualified immunity; and (3) the City is not liable under <u>Monell</u>.

A.  <u>The Plaintiff's Section 1983 Claim</u>

Section 1983 provides a remedy for any person whose constitutional rights have been deprived by someone acting under color of state law.[2]  Thus, a section 1983 claim has two elements.  First, the conduct must be committed by a person

---

[1] A party moving for summary judgment must show that there are no issues of material fact and that judgment is appropriate as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of showing that there are no issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once a properly supported motion for summary judgment is made the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).

[2] The relevant part of the statute says: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983.

-7-

acting under color of state law.  The parties do not dispute that
Bloomfield was a City employee acting on behalf of his employer
at the time of the accident.  Second, the conduct must deprive a
person of rights secured by the Constitution.  The plaintiff
alleges a violation of Suarez's substantive due process rights
under the Fourteenth Amendment.

     1.   The State-Created Danger Theory

     The state does not have an affirmative obligation to
protect its citizens from private harm.  DeShaney v. Winnebago
Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989).  In
DeShaney, the Supreme Court held that Joshua DeShaney's
substantive due process rights were not violated when state
social services personnel failed to remove him from his father's
custody following reports of physical abuse.  Joshua ultimately
suffered extensive brain damage following a severe beating by his
father.  In finding no constitutional violation, the Court held
that the Due Process Clause is "a limitation on the State's power
to act, not . . . a guarantee of certain minimal levels of safety
and security."  Id. at 193, 195.

     Courts have recognized only two exceptions to the
DeShaney rule.  The first, which is not at issue in this case,
occurs when there is a "special relationship" between the state

and the citizen, obligating the state to protect the person from harm because the citizen is in state custody.  Kneipp v. Tedder, 95 F.3d 1199, 1209 (3d Cir. 1996).

The plaintiff's claim is based on the second exception, the state-created danger theory.  The state-created danger theory finds its origins in the Court's language in DeShaney that although the state "may have been aware of the dangers Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." Thus, state actions that create danger or render a person more vulnerable to harm can be the basis for Fourteenth Amendment claims.  Deshaney, 489 U.S. at 201.

Importantly, the Supreme Court cautioned that the "Due Process Clause does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries."  State-created danger claims should not transform common law torts into constitutional violations.  Collins v. City of Harker Heights, 503 U.S. 115, 128 (1992) (internal quotations omitted); Kaucher v. Cnty. of Bucks, 455 F.3d 418, 435 (3d Cir. 2006).  The "Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society."

-9-

<u>Cnty. of Sacremento v. Lewis</u>, 523 U.S. 833, 848 (1998).

In <u>Kneipp</u>, the Court of Appeals for the Third Circuit defined a four-part test for the elements of a state-created danger claim:[3]

> (1) the harm ultimately caused was foreseeable and fairly direct;
> (2) a state actor acted with a degree of culpability that shocks the conscience;
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

<u>Bright v. Westmoreland Cnty.</u>, 443 F.3d 276, 281 (3d Cir. 2006) (internal quotations omitted).

### 2. The Degree of Culpability

The defendant focuses its argument on the second prong of the <u>Kneipp</u> test, and argues that, at most, Bloomfield's conduct amounts to recklessness or negligence, but not "a degree of culpability that shocks the conscience."

To prevail, a plaintiff must demonstrate something more

---

[3] Although <u>Kneipp</u> is still good law, the Court of Appeals has since clarified the elements of the test.  <u>See</u> <u>Rivas v. City of Passaic</u>, 365 F.3d 181, 202-03 (3d Cir. 2004) (Ambro, J., concurring).

than negligence or harmful behavior, which are "categorically" insufficient to shock the conscience.  <u>Lewis</u>, 523 U.S. at 848-49. In addition, the Supreme Court has explained, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense."  <u>Id.</u> at 846 (internal quotations omitted).

The test for what shocks the conscience differs depending on the circumstances of the case.  <u>Rivas v. City of Passaic</u>, 365 F.3d 181, 195 (3d Cir. 2004).  In a situation, such as a high-speed chase, where decisions are made "in haste, under pressure, and . . . without luxury of a second chance," only an "intent to harm" standard of culpability would shock the conscience.  <u>Lewis</u>, 523 U.S. at 853.  In contrast, where more time for deliberation is available, the culpability standard is lower.  At the lowest end of the culpability spectrum, where the defendant had the opportunity to deliberate about his decision, only deliberate indifference must be proven to show conscience shocking behavior.  If the state actor acts with some urgency, but does not need to make a split-second decision, gross negligence or arbitrariness must be shown.  <u>Rivas</u>, 365 F.3d at 195-96; <u>Miller v. City of Phila.</u>, 174 F.3d 368 (3d Cir. 1999).

The Court of Appeals defines the correct test for the actions of medical personnel responding to an emergency as whether they "consciously disregarded, not just a substantial

risk, but a great risk that serious harm would result." <u>Rivas</u>,
365 F.3d at 196; <u>Brown v. Commonwealth of Pa. Dep't of Health
Emergency Med. Servs. Training Inst.</u>, 318 F.3d 473 (3d Cir.
2003).  This is a less onerous standard than intent to harm, but
requires more than just knowledge that there was a substantial
risk that harm would occur.  <u>Rivas</u>, 365 F.3d at 195-96.  Notably,
no case directly addresses the legal standard applicable to
operation of an emergency response vehicle.  The Court concludes
that the standard espoused in <u>Rivas</u> and <u>Brown</u> is applicable
because, as in those cases, this case presents a state actor's
response to a medical emergency.

The Court concludes that no reasonable jury could find
that Bloomfield consciously disregarded a great risk that serious
harm would result.  The case law is clear that even reckless,
wanton, and dangerous driving by state actors does not shock the
conscience.  For example, in <u>Fagan</u>, the Court of Appeals held
that a high-speed pursuit by a police officer through a
residential neighborhood in response to a minor traffic violation
did not shock the conscience.  <u>Fagan v. City of Vineland</u>, 22 F.3d
1296 (3d Cir. 1994).[4]  The Court of Appeals noted that this was

---

[4] Following <u>Lewis</u>, the "intent-to-harm" standard would now
apply to this sort of high-speed chase.  Writing before <u>Lewis</u>,
the <u>Fagan</u> court did not apply an intent-to-harm standard and
still found that the behavior did not shock the conscience.
<u>Fagan</u>, 22 F.2d 1296, 1303-08.

-12-

in line with the holdings of other circuit courts.  <u>See, e.g.</u>,
<u>Tempkin v.  Frederick Cnty. Commm'rs</u>, 945 F.2d 716, 718 (4th Cir.
1991) ("wanton and reckless" ten-mile high-speed pursuit in
violation of police policy for minor infraction did not shock the
conscience).  Courts have not found conscience-shocking behavior
even when officers traveled at high speeds without warning lights
or sirens activated or ran through red lights.  In <u>Leddy</u>, a
police officer was responding to a non-emergency call, traveling
at nearly 60 miles per hour without lights and sirens.  <u>Leddy v.
Twp. of Lower Merion</u>, 114 F. Supp. 2d 372, 376-77 (E.D. Pa.
2000).  The court found that this behavior, "while not
condonable" did not constitute even "gross negligence or
arbitrariness."  <u>Id.</u>  In <u>Gillyard v. Stylios</u>, the court held that
running a red light while traveling over 45 miles per hour did
not shock the conscience under any standard.  No. 97-6555, 1998
U.S. Dist. LEXIS 20251, at *7 (E.D. Pa. Dec. 23, 1998); <u>see also</u>
<u>Rooney v. Watson</u>, 101 F.3d 1378, 1381 (11th Cir. 1996) (an
officer traveling at 82 miles per hour without lights or sirens
did not shock the conscience).

     The plaintiff tries to distinguish these cases because
they involve police response to unlawful acts.  The Court of
Appeals held, however, that the "shocks the conscience" standard
applies in both "police pursuit cases" and "to the actions of

-13-

emergency medical personnel who likewise have little time for
reflection, typically making decisions in haste and under
pressure." Brown, 318 F.3d at 480.  Bloomfield was responding to
a 911 call for medical assistance, a situation calling for
urgency.  The fact that Bloomfield was a medical responder and
not a police officer does not affect the necessity of a prompt
response.  To the extent that police officers must react with
less time for deliberation, the courts account for that
difference by applying an intent-to-harm standard when split-
second decision making is required.

        The plaintiff also argues that cases involving speeding
vehicles are distinguishable from this case because speeding is a
common and expected occurrence, and therefore poses less danger.
But courts have found that conduct was not conscience-shocking
when officers engaged in traffic violations more dangerous than
just speeding.  See, e.g., Gillyard, 1998 U.S. Dist. LEXIS 20251.

        To find in favor of the plaintiff, a jury would need to
conclude that traveling the wrong way down a one-way street for
several blocks and proceeding through an intersection with a
green light, all while the emergency vehicle's lights and sirens
were active, amounts to a conscious disregard of a great risk of
serious harm.  The Court finds that no reasonable jury could come
to that conclusion.

Bloomfield understood Directive 26.  If the Court accepts the evidence in a light most favorable to the non-moving party, the evidence shows that Bloomfield turned and continued on 30th Street knowing he was going the wrong direction.  However, Bloomfield's lights and sirens were activated and he slowed before entering the intersection with Dauphin Street.  It is not clear whether Bloomfield's actions even run afoul of the Pennsylvania state law allowing drivers to disregard directional regulations when responding to an emergency.  It would be a question for a jury to determine if Bloomfield failed to meet this statutory standard of care, but no reasonable jury could conclude that Bloomfield engaged in the sort of "egregious conduct" that must be proven to sustain a state-created danger claim.

Given the Supreme Court's caution against importing tort law into constitutional regulation, a three-block traffic violation in response to a 911 call should not open the door to finding a constitutional violation.

B.   <u>Bloomfield's Qualified Immunity</u>[5]

Because the Court concludes that Bloomfield's conduct did not violate a constitutional right, the Court does not need to address Bloomfield's qualified immunity.

C.   <u>The City's Liability</u>

Finally, the defendant argues that the plaintiff has failed to make out a claim that the City is liable under section 1983.   The plaintiff argues that the relevant City policy which led to Suarez's death was the failure to properly train fire rescue personnel in driver safety.

In order to prevail on a claim against the City, the plaintiff needs to show that the alleged constitutional violation was a result of a municipal policy, custom, or practice.   <u>See Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 691 (1978).   A city cannot be held responsible on a theory of respondeat superior. Rather, the plaintiff must show that the municipality itself,

---

[5] "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).   To determine whether the defendant is entitled to qualified immunity, the Court must find that the defendants' conduct, taken in a light most favorable to the party asserting an injury, violated a constitutional right, and second, that the constitutional right was clearly established.   <u>Saucier v. Katz</u>, 533 U.S. 194, 201-02 (2001).

through the implementation of a policy or custom, caused the
constitutional violation claimed by the plaintiff.  Id.

As a threshold matter, in the Third Circuit, the
plaintiff does not need to show that an individual city actor was
liable for a constitutional violation in order to pursue a claim
against a municipality.  Fagan v. City of Vineland, 22 F.3d 1283,
1293 (3d Cir.), aff'd en banc, 22 F.3d 1296, 1302 (3d Cir. 1994).
In Fagan, the Court of Appeals held that "an underlying
constitutional tort can still exist even if no individual [state
actor] violated the constitution."  Id.  The plaintiff may pursue
a claim against a municipality if she can show that she suffered
an injury "which amounts to deprivation of life or liberty,
because the officer was following a city policy reflecting the
city policymakers' deliberate indifference to constitutional
rights."  If the plaintiff makes this showing, the city is
directly liable, regardless of whether an individual actor is
found liable.[6]  Id.

---

[6] The defendant argues that the plaintiff must prove a
constitutional violation in order to proceed against the City and
that Fagan has been questioned by a later Court of Appeals
decision and directly rejected by other courts.  See Mark v.
Borough of Hatboro, 51 F.3d 1137 1153 n.13 (3d Cir. 1995) ("It
appears that by focusing almost exclusively on the 'deliberate
indifference prong' . . . the panel opinion [in Fagan] did not
apply the first prong -- establishing an underlying
constitutional violation."); Trigalet v. City of Tulsa, 239 F.3d
1150, 1154-55 & n.4 (11th Cir. 2001) (rejecting the holding of
Fagan and listing other circuits which have disagreed with the

To make out a failure to train claim, a plaintiff must show that "the failure to train amounts to deliberate indifference to the rights of persons with whom the [city actors] come into contact." City of Canton v. Harris, 489 U.S. 378, 387 (1989). A plaintiff can show a municipal policy of deliberate indifference in two ways. The plaintiff can show that the city failed to respond to a pattern of violations. Alternately, "in a narrow range of circumstances," a plaintiff can show that "violation of federal rights may be a highly predictable consequence" of the city's failure to take action. Berg v. Cnty. of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) (quoting Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 408-09 (1997)). Put another way, there must be a showing that the "need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." In those cases, the failure to train "may fairly be said to represent a policy for which the city is responsible." City of Canton, 489 U.S. at 390.

For example, in City of Canton, the defendant police

---

decision); Thomas v. City of Phila., 804 A.2d 97, 112 (Pa. Commw. Ct. 2002) (rejecting the holding of Fagan). The Court concludes that applying the standard laid out in Fagan, the plaintiff has not met her burden, and therefore does not consider this argument.

officers failed to summon medical help for a woman in state custody after she repeatedly collapsed.  Evidence showed that the decision to provide medical treatment was at the discretion of police shift commanders, who were not provided any special training to make that determination.  Id. at 382-83.  In Fagan, the Court of Appeals noted its concern for a situation in which "an improperly trained police officer may be ignorant of the danger created by his actions and inflicts injury" while the "city's policymakers . . . are fully aware of those dangers but deliberately refuse to require proper training."  Id. at 1292.  For example, arming officers without training them in the constitutional limitations of the use of force would amount to deliberate indifference.  Berg v. Cnty. of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000).

        Finally, the plaintiff must also prove a causal connection: that there is a direct link between the municipality's failure to train and the alleged constitutional deprivation.  City of Canton, 489 U.S. at 385.  The municipal policy must be the "moving force" behind the injury alleged.  Bryan Cnty., 219 F.3d at 276.

        Here, the plaintiff has not sustained her burden.  No reasonable jury could conclude that the City's driver training reflected the "city policymaker's deliberate indifference to

-19-

constitutional rights." <u>Fagan</u>, 22 F.3d at 1292.  There is no evidence that City policymakers ignored a pattern of constitutional violations arising from vehicular accidents. Although City officials may have been aware of a rising number of accidents in the early 2000s, there is no evidence that these accidents resulted in constitutional violations.  Similarly, although it is undisputed that FSP's occasionally bucked traffic in violation of Directive 26, and did so with the seeming approval of supervisors, there is no evidence that bucking traffic led to a pattern of constitutional violations.  Finally, no reasonable jury could conclude that the City's policy towards driving safety and bucking traffic led to a situation that was "likely to result in constitutional violations." <u>City of Canton</u>, 489 U.S. at 390.  This is not a situation where City policymakers are aware of a danger of creating constitutional wrongs but chose to ignore that likelihood.

   In addition, the plaintiff has not presented evidence sufficient to convince a reasonable jury that the City's alleged failure to train was the "moving force" behind Suarez's injuries. The plaintiff has not shown how the City's failure to train, and not Suarez's decision to cross 30th Street against a red light, was the moving force behind his injury.

   An appropriate order shall issue.

-20-